## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| CHERI FORTE, individually, on behalf of her minor child L.C., and on behalf of all others similarly situated, | |
| | Case No. _____ |
| Plaintiffs, | |
| v. | Class Action Complaint |
| KIK INTERNATIONAL LLC, d/b/a KIK CONSUMER PRODUCTS, and BIO-LAB, INC. | Jury Demand |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Cheri Forte and on behalf of her minor child L.C. ("Plaintiffs"), individually and on behalf of all others similarly situated ("proposed Class Members"), bring this class action complaint against Defendants KIK International LLC, doing business as KIK Consumer Products, and Bio-Lab, Inc. for damages resulting from a fire and explosion at its Conyers, Georgia, chemical plant on September 29, 2024.

### INTRODUCTION

1.     In the early hours of September 29, 2024, a chemical reaction erupted at Defendant's chemical plant in Conyers, Georgia, known as the "Biolab" or "Bio-Lab" chemical plant ("BioLab Plant").

1

2.      The fire and explosion resulted in an enormous chemical fire that caused a massive toxic smoke and dust plume that could be seen for miles.[1]

3.      The fire, which sparked on or about 5 a.m., took firefighters nearly twelve hours to extinguish.[2] Because of the fire and resulting smoke and dust, over 17,000 people were forced to evacuate,[3] with the Environmental Protection Agency ("EPA") and the Georgia Environmental Protection Division ("GEPD") ordering another 90,000 people to shelter-in-place after air quality surveys "revealed the harmful irritant chlorine, which was detected in the air emitting from the incident location of BioLab."[4]

4.      Plaintiffs received Public Safety Alerts on their phone informing them that a "LOCAL AREA EMERGENCY" was declared by the Georgia Emergency Management Agency on behalf of the EPA "due to ROCKDALE COUNTY BIOLAB FIRE." Authorities across the affected area echoed the urge to stay indoors, with the Atlanta-Fulton County Emergency Management Agency issuing a statement

---

[1] *Interstate Is Closed Outside Atlanta as Residents Evacuate Due to a Chemical Plant Fire* (last updated Sept. 29, 2024), https://apnews.com/article/biolab-chemical-plant-fire-evacuation-a9c7ddcbec42fcd891831101b9ccd1d4.
[2] Cindy Von Quednow, Lauren Mascarenhas & Brenda Goodman, *Shelter-In-Place, Evacuation Orders Lifted a Day After Chemical Plant Fire Sent a Plume Containing Chlorine High into the Air*, https://www.msn.com/en-us/news/us/thousands-told-to-stay-home-a-day-after-chemical-plant-fire-sent-a-plume-containing-chlorine-high-into-the-air/ar-AA1rqj3h?ocid=BingNewsSerp.
[3] Brady Knox, *Colossal Chemical Plant Fire in Georgia Prompts Evacuation Of 17,000 People*, WASHINGTON EXAMINER (Sept. 30, 2024), https://www.washingtonexaminer.com/policy/energy-and-environment/3170590/colossal-chemical-plant-fire-georgia-prompts-evacuation-17000-people.
[4] *Id.*

urging those sheltering in place to "STAY INSIDE, CLOSE windows and doors, TURN OFF air conditioning & other ventilation systems."[5]

5.      This Class Action Complaint seeks redress for residents, property owners, employees and businesses living, working, and/or located in and around Defendant's chemical plant fire in Conyers, Georgia, that resulted in the contamination of, and exposure to, massive amounts of chlorine gas and other toxic chemicals. Because of this chemical fire, Plaintiffs and the proposed Class have all suffered, among other things, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, economic damages, and a substantial increase in future medical problems associated with the exposure to toxic chemicals as alleged more specifically below.

## PARTIES

6.      Plaintiffs are citizens and residents of Conyers, Georgia, where they intend to remain.

7.      Defendant KIK International LLC, d/b/a KIK Consumer Products is a Delaware Limited Liability Company with its principal place of business in Lawrenceville, Georgia. Upon information and belief, KIK International is wholly owned by KIK U.S. Holdings LLC, which is a citizen of the States of Delaware and

---

[5] David Chiu, *'Scary' Chemical Plant Fire Sends Chlorine into Air, Forcing More Than 90,000 Georgia Residents to Shelter in Place*, PEOPLE (Sept. 30, 2024), https://people.com/georgia-chemical-plant-fire-forces-residents-to-shelter-in-place-8720618.

Illinois.  Defendant Bio-Lab, Inc. is a Delaware Corporation that lists its principal place of business in Ontario, Canada.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (i) there are more than one hundred (100) Class Members; (ii) the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs; and (iii) some Class Members are citizens of states different than Defendant.

9.     Indeed, the number of Class Members is likely at least 17,000 persons who were all exposed to toxic chemicals, likely requiring medical care and checkups for years to come.

10.    The Court has personal jurisdiction over Defendant because it regularly conducts business in this District, operates the Biolab chemical plant that is at the center of this class action, and operates its principal place of business in this District.

11.     Moreover, venue is proper in this District under 28 U.S.C. § 1391 for the same reasons and because the allegations giving rise to the claims asserted herein substantially occurred in this District.

## FACTUAL ALLEGATIONS

12.    Defendant touts itself as "one of North America's largest independent manufacturers of consumer products," with "major positions in the multi-billion

dollar household and pool categories."[6]

### *The Chemical Fire Was Foreseeable by Defendant*

13.     Defendant has an alarming history of chemical fires at its facilities. Defendant has had at least three chemical fires in the past seven years at the BioLab Plant.[7] In addition, on May 25, 2004, Defendant had a "huge fire" after "multiple explosions" erupted in a warehouse at the Conyers Plant,[8] which "prompted the evacuation of 300 people as a chlorine-laden cloud rolled through the area." [9] The fire was so massive that firefighters used "close to 25 million gallons of water" to extinguish the blaze, and "a sizeable fish kill" resulted from the water runoff spent fighting the fire.[10] The EPA reported that "the effect of the plume was felt more than 50 miles away."[11]

14.     In June of 2016, a chemical fire broke out when "chlorine pellets stored in 5-gallon buckets in an outdoor storage shed had a chemical reaction and caught

---

[6] https://www.kikcorp.com.

[7] Kelly Yamanouchi, *Update: BioLab Fire Conyers, GA, Not Rare Incident, Records Show* (Sept. 30, 2024), https://www.firehouse.com/operations-training/video/55143584/update-sundays-fire-at-conyers-ga-chemical-plant-latest-for-owner.

[8] *Fire Rages at Chemical Warehouse Near Atlanta*, NBC NEWS (May 25, 2004), https://www.nbcnews.com/id/wbna5059026#.V1K7EvkrIdU.

[9] Jeff Martin, *Over 90,000 Georgia Residents Taking Shelter After Chemical Fire as Haze, Smell Spreads to Atlanta* (last updated Sept. 30, 2024), https://apnews.com/article/biolab-chemical-plant-fire-chlorine-evacuation-9552ac17f3674ecbd1a52be13b08413f.

[10] U.S. Env't Protection Agency, *Final Pollution Report* (June 28, 2004), https://www.epa.gov/sites/default/files/2014-03/documents/10114940.pdf.

[11] U.S. Env't Protection Agency, *BioLab Fire*, ON-SCENE COORDINATOR, https://www.epaosc.org/site/site_profile.aspx?site_id=A4EY&fbclid=IwZXh0bgNhZW0CMTE AAR0aHIYmLKx3Hh5cMER6YEnVELjDsfOfbhpt_3zxwMDsdVcZGjlAamJOw2Y_aem_735j upFJcA56GVw6xtzUUg

fire," forcing residents within one mile of the Conyers Plant to be evacuated.[12]

15.     On September 14, 2020, the BioLab Plant caught fire after a water leak and released a "plume of hazardous chemicals," causing a portion of Interstate 20 to be shut down for approximately six hours and forcing surrounding businesses to evacuate.[13] After investigating, the U.S. Chemical Safety Board ("CSB") found that "the building was not equipped with an automated water detector or alarm system to alert employees of a water leak."[14] In addition, the Rockdale County Fire Department's "access to the decomposing pallets was hindered by other surrounding poorly stacked pallets of materials,"[15] which contributed to their inability to remove unaffected materials away from combusting materials. CSB reported that chlorine concentrations at a business property approximately one-quarter of a mile away were measured "as high as 12ppm, which greatly exceeded OSHA's chlorine permissible exposure limit of 1 ppm."[16] Nine firefighters were taken to the hospital for evaluation after inhaling hazardous vapors.[17]

16.     Additionally, Defendant has faced at least $67,000 in fines and had

---

[12] Jonathan Raymond, *BioLab in Conyers Had Similar Chemical Fire, Smoke Plume Situation in 2004* (Sept. 29, 2024), https://www.11alive.com/article/news/local/biolab-chemical-fire-conyers-georgia-2004-similar-incident/85-d71cc6d6-78cf-4283-9510-03c93b2ee71c.
[13] U.S. Chemical Safety & Hazard Investigation Bd., *Investigative Report: Trichloroisocyanuric Acid Reaction, Decomposition, and Toxic Gas Release at Bio-Lab, Inc.* (April 24, 2024), https://www.csb.gov/assets/1/6/biolab_investigation_report_2023-4-24.pdf.
[14] *Id*.
[15] *Id.*
[16] *Id*.
[17] *Id*.

more than a dozen violations reported by the Occupational Safety and Health Administration ("OSHA") at the facility in Conyers since the fire in 2004, including for an incident where an employee had two fingers caught in a press and amputated.[18]

17.    Defendant's problem with chemical fires at its facilities extends beyond Georgia. On August 27, 2020, Hurricane Laura damaged buildings at Defendant's facility in Westlake, Louisiana, allowing rainwater to leak into the facility.[19] The rainwater initiated a chemical reaction, which initiated a fire and released "a large plume of hazardous gases, including toxic chlorine."[20] A portion of the nearby interstate was closed for over 28 hours, and local officials issued a shelter-in-place order "due to the release of hazardous gases."[21] CSB Board Member Catherine Sandoval stated that "[h]ad Bio-Lab followed the available guidance, the incident could have been prevented."[22] CSB's final report after investigation identified five safety issues:

> a) **Extreme Weather Preparation**: Bio-Lab did not learn the importance of preparing for extreme weather after the 2017 Arkema incident in

---

[18] *Here's What We Know About The BioLab Plant's History* (Sept. 30, 2024), https://www.msn.com/en-us/news/other/conyers-biolab-facility-violated-safety-standards-at-least-18-times-has-history-of-chemical-fires-records/ar-AA1ruLq7?ocid=BingNewsSerp.

[19] *U.S. Chemical Safety Board Releases Final Report into 2020 Toxic Gas Release and Chemical Fire at Bio-Lab Facility in Westlake, LA* (April 24, 2023), https://www.csb.gov/us-chemical-safety-board-releases-final-report-into-2020-toxic-gas-release-and-chemical-fire-at-bio-lab-facility-in-westlake-la.

[20] *Id*.

[21] *Id*.

[22] *Id*.

Crosby, TX, which also occurred following a Category 4 hurricane. Bio-Lab did not implement industry guidance for extreme weather preparation that was updated and published after the Arkema incident.

b) **Process Hazard Analyses Implementation**: TCCA is not covered by the Occupational Safety and Health Administration's (OSHA) Process Safety Management (PSM) standard. Bio-Lab voluntarily implemented some elements of the PSM standard and even conducted a 2010 Process Hazard Analysis (PHA) but did not implement a PHA recommendation to determine whether buildings at the facility (including their roofs) could withstand damage from hurricane-strength winds.

c) **Emergency Preparedness and Response**: Bio-Lab experienced an approximately five-and-a-half-hour delay in responding to the event, which likely increased the severity of the event.

d) **Adherence to Applicable Hazardous Materials Codes**: The Lake Charles plant did not adhere to the existing National Fire Protection Association's codes for high-hazard industry occupancies, which include safety precautions such as automatic extinguishing systems or other protections to minimize danger to occupants before they have time to evacuate.

e) **Regulatory Coverage of Reactive Chemical Hazards**: TCCA is not

covered by OSHA's PSM standard or the Environmental Protection Agency's (EPA) Risk Management Program Rule. Consequently, the facility was not required to implement baseline process safety management elements of its TCCA-related operations under these regulations.[23]

18.     CSB issued several recommendations to Defendant after the fire, including:

> [C]onstructing new buildings and maintaining existing buildings and structures to withstand hurricane winds and flooding; implementing safeguards and processes to ensure that hazardous chemicals are not released during extreme weather events; improving its Process Hazard Analysis (PHA) action item management system; performing process hazard analyses (PHAs) on all buildings and units processing or storing TCCA; and improving [Defendant's] emergency response capabilities.[24]

19.     In November of 2022, Defendant celebrated a "grand reopening" of the Westlake facility.[25] The then-plant manager at the Westlake facility said in a statement that "[w]e are pleased to be welcoming our team back to our newly rebuilt facility, which is one of the most advanced trichlor production facilities in the world and even stronger and safer than before." [26] Four months later, a chlorine leak at the

---

[23] *Id.*

[24] *Id.*

[25] *Update: BioLab Fire Conyers, GA, Not Rare Incident, Records Show* (September 30, 2024), https://www.firehouse.com/operations-training/video/55143584/update-sundays-fire-at-conyers-ga-chemical-plant-latest-for-owner.

[26] *Id.*

facility "caused a visible cloud to loom over the city of Westlake for hours," prompting local officials to issue a shelter-in-place order and urge those in the affected area to "close their windows and doors [and] turn off any air conditioning."[27] On July 2, 2024, another fire at the Westlake facility prompted the closure of ten miles of I-10, and local officials issued a shelter-in-place order for residents and casino patrons encompassing a half mile radius.[28]

20.    According to Rockdale County's Fire Chief, the September 29, 2024 fire "ignited when a sprinkler head malfunctioned around 5 a.m. Sunday at the BioLab plant," "caus[ing] water to mix with a water-reactive chemical, producing a plume of chemicals."[29] The fire started at approximately 5 a.m. and took firefighters over 11 hours, until approximately 4 p.m., to get the fire under control.[30] The resulting plume of chemicals was enormous— it could be seen as far as 30 miles (50 kilometers) away at Atlanta's international airport.[31]

---

[27] Natalie McLendon, *Here's What We Know About the Biolab Chlorine Leak*, SOUTHERLY (March 27, 2023), https://southerlymag.org/2023/03/27/heres-what-we-know-about-the-biolab-chlorine-leak.

[28]   *BioLab Suffers Chemical Incident, Possible Fire* (July 31, 2024), https://www.serviceindustrynews.net/2024/07/31/biolab-suffers-chemical-incident-possible-fire.

[29] *Interstate Is Closed Outside Atlanta as Residents Evacuate Due to a Chemical Plant Fire* (last updated Sept. 29, 2024), https://apnews.com/article/biolab-chemical-plant-fire-evacuation-a9c7ddcbec42fcd891831101b9ccd1d4.

[30] *Shelter-In-Place Order For More Than 90,000 Georgia Residents Is Lifted After Chemical Fire* (Sept. 30, 2024), https://apnews.com/article/biolab-chemical-plant-fire-chlorine-evacuation-9552ac17f3674ecbd1a52be13b08413f

[31]  *Id.*



***<u>Defendant Failed to Comply with NFPA guidelines and Other Industry Standards.</u>***

21.    The National Fire Protection Association ("NFPA") has promulgated numerous codes, standards, recommended practices, guides and methods for implementing fire safety standards, including the International Fire Code ("IFC") and the National Fire Codes ("NFC"). Georgia's Administrative Code has adopted those codes, standards, recommended practices, guides and methods, as modified in Ga. Comp. R. & Regs. r. 120-3-3-.04.[32]

22.    The standards identified in the NFPA's 101 Life Safety Code for high-

---

[32]    Rules & Regs. for the State of Georgia, https://rules.sos.ga.gov/GAC/120-3-3-.04?urlRedirected=yes&data=admin&lookingfor=120-3-3-.04.

hazard industrial occupancies requires automatic extinguishing systems or other protection to minimize danger to occupants before they have time to evacuate. Indeed, as the CSB noted in its report on Defendant's 2020 Westlake Facility Chemical Fire, this requirement extends as far back as the 1973 edition of the NFPA 101 Life Safety Code, which states:

> Every required automatic sprinkler system, fire detection and alarm system, exit lighting, fire door, and other item of equipment required by this Code shall be continuously in proper operating condition. [43, pp. 101-6].

> High hazard contents shall be classified as those which are liable to burn with extreme rapidity or from which poisonous [toxic] fumes or explosions are to be feared in the event of fire [43, pp. 101-15].

> High Hazard Industrial Occupancy. Includes those buildings having contents which are liable to burn with extreme rapidity or from which poisonous [toxic] fumes or explosions are to be feared in the event of fire [43, pp. 101-167].[33]

23.    Moreover, NFPA 25 Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems [34] contains several general requirements, including that: "[t]he property owner or designated representative shall correct or repair deficiencies or impairments," [35] and "[m]aintenance shall be

---

[33] *U.S. Chemical Safety & Hazard Investigation Bd., Investigative Report: Trichloroisocyanuric Acid Reaction, Decomposition, and Toxic Gas Release at Bio-Lab, Inc.* (April 24, 2024), https://www.csb.gov/assets/1/6/biolab_investigation_report_2023-4-24.pdf.
[34] National Fire Protection Assoc., *NFPA 25: Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems* (2020 ed.).
[35] *Id.* at 25-14.

performed to keep the system equipment operable."[36]

24.     NFPA 400 Hazardous Materials Code [37] requires that "[i]f swimming pool chemicals are involved in a fire or reaction, use large quantities of water."[38] The code also warns that "[T]richlor can react with small amounts of water over a period of time and form NCl3 [nitrogen trichloride], a potentially explosive compound . . . water should continue to be added. Water in sufficient quantities is still the best method to control an oxidizer in a fire."[39]

25.     In addition, 1992, OSHA promulgated the Process Safety Management ("PSM") Standard[40] for facilities that process certain chemicals. Although this regulation does not specifically list Trichloroisocyanuric acid ("TCCA")—which is contained in the pool and spa chemicals Defendant manufactures—"TCCA is capable of undergoing a highly hazardous chemical reaction that can release toxic chlorine," which is covered by OSHA's PSM standard.[41]

26.     OSHA's PSM Standard states that "the key provision of PSM is process hazard analysis ("PHA")—a careful review of what could go wrong and what

---

[36] *Id*. at 25-16.
[37] National Fire Protection Assoc., *NFPA 400: Hazardous Materials Code* (2022 Ed.).
[38] *Id*. at 400-208.
[39] *Id*. at 400-207.
[40] 29 CFR § 1910.119.
[41] *U.S. Chemical Safety & Hazard Investigation Bd., Investigative Report: Trichloroisocyanuric Acid Reaction, Decomposition, and Toxic Gas Release at Bio-Lab, Inc*. (April 24, 2024), https://www.csb.gov/assets/1/6/biolab_investigation_report_2023-4-24.pdf.

safeguards must be implemented to prevent releases of hazardous chemicals."[42] The

PSM Standard further states:

> [T]he process hazard analysis shall be performed by a team with expertise in engineering and process operations…. The employer shall establish a system to promptly address the team's findings and recommendations; assure that the recommendations are resolved in a timely manner and that the resolution is documented; document what actions are to be taken; complete actions as soon as possible; develop a written schedule of when these actions are to be completed; [and] communicate the actions to operating, maintenance and other employees whose work assignments are in the process and who may be affected by the recommendations or actions.[43]

27.    Upon information and belief, Defendant failed to properly implement

basic safety practices widely known throughout the industry, including, but not

limited to, failing to meet the minimum standards of the IFC, NFPA's 101 Life Safety

Code, NFPA 25, and OSHA's PSM Standard.

28.    For example, had Defendant's fire detection system and sprinkler

system complied with NFPA 101 Life Safety code, it could have begun applying

large amounts of water to the combusting materials. Had Defendant adhered to

OSHA's PSM Standard, it could have conducted a process hazard analysis to

carefully review of what could go wrong at the Conyers facility and what safeguards

needed to be implemented to prevent releases of hazardous chemicals.

---

[42] U.S. Occupational Safety and Health Admin. (OSHA), "*Process Safety Management OSHA 3132*," (2002), https://www.osha.gov/sites/default/files/publications/osha3132.pdf.
[43] *Id.*

29.     Given the nature of the dangerous chemicals processed in Defendant's Conyers Facility and the fact that the risk of chemical fires is a well-known threat to all companies who manufacture pool and spa chemicals containing TCCA, Defendant was on notice of the harms associated with its failure to implement reasonable, industry standard safeguards. Defendant was always fully aware of its obligations to implement reasonable safety measures and—especially given Defendant's lengthy history of chemical fires at its facilities—was aware of the significant repercussions that would result from its failure to do so.

### *Plaintiffs' Experiences*

30.     Plaintiff Forte and her minor child L.C. have been directly affected by Defendant's chemical explosion at the BioLab Plant.

31.     Around 11 AM on the day of the chemical plant explosion, Plaintiff Forte and her minor child of less than ten years of age began receiving cell phone alerts to shelter in place, stay inside, shut and seal the doors, and to stay inside.

32.     The alerts Plaintiffs received were labeled "Emergency alert: Severe." The picture below is a true and accurate copy of one of the cell phone alerts Plaintiffs received.



33.   Indeed, Plaintiffs could smell a thick chemical smell in the air. Moreover, the smell was so bad that Plaintiffs could taste the chlorine.

34.   Plaintiffs reside in Conyers, Georgia, and the plume of smoke and chemical fumes was almost directly above their house, with fog and smoke beginning to envelop the surrounding area. The below photos are true and accurate photos of the chemical plant toxic smoke and fumes directly over Plaintiffs' home.





35.     Later, about an hour after the first notification, Plaintiffs received another notification explaining that they should shelter-in-place or evacuate the area until 8 PM.

36.     Still later, another notification told Plaintiffs to at least shelter-in-place until midnight. Still, not all individuals in the affected area received notifications, as Plaintiff Forte's sister, who lives nearby, never received these notifications.

37.     According to Plaintiff Forte, the BioLab Plant has reported fires three times in the previous approximately five years.

38.     Because of the smoke and toxic fumes, Plaintiff Forte began experiencing a bad headache, for which she took medication. Moreover, her eyes began burning and itching, so she applied a warm compress to her face.

39.     Plaintiff's minor child L.C. could smell and taste chlorine in the air, explaining that it smelled like the pool. L.C. also experienced some burning of her eyes.

40.     Two days after the explosion, Plaintiffs have noticed a worsening of the smell of the toxic fumes surrounding the BioLab plant.

### *Effects of Toxic Fumes, Including Chlorine*

41.     Chlorine gas is a greenish yellow gas with a strong, irritating odor that is heavier than air, allowing it to settle and accumulate on surface areas.[44]

42.     According to the U.S. Centers for Disease Control and Prevention, chlorine gas stays close to the ground and spreads quickly.[45]

43.     Smelling the gas or feeling an irritation "tells you that you are exposed to chlorine."[46]

---

[44] *Chlorine Gas: Get the Facts*, https://www.poison.org/articles/chlorine-gas (last visited October 1, 2024).
[45] U.S. Ctrs. for Disease Control & Prevention, *Chlorine: Chemical Fact Sheet* (Sept. 6, 2024), https://www.cdc.gov/chemical-emergencies/chemical-fact-sheets/chlorine.html.
[46] *Id.*

44.     When chlorine touches the lungs or eyes, "it creates an acid that can hurt these tissues," including by causing blurred vision, tearing eyes, coughing, chest tightness, burning sensations, respiratory failure and breathing difficulties, among other difficulties. [47]

45.     "No known cure exists for chlorine exposure."[48]

46.     Although minor exposures may result in merely temporary symptoms that return to normal within 7 to 14 days, more serious exposure may cause continued respiratory/lung issues, including reactive airways dysfunction syndrome ("RADS"), asthma, teeth weakening, and flu-like symptoms.[49]

47.     When chlorine comes into contact with moisture, "it forms hypochlorous acid (HClO) and hydrochloric acid (HCl); the unstable HClO readily decomposes, forming oxygen free radicals. Because of these reactions, water substantially enhances chlorine's oxidizing and corrosive effects."

48.     "Significant exposure can lead to serious health consequences and even death."[50]

49.     Factors that affect the severity of chlorine exposure include the amount of chlorine, the length of the exposure, the nature of the exposure, and whether the

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] WebMD, *What to Know About Chlorine* (medically reviewed on July 16, 2023, https://www.webmd.com/first-aid/what-to-know-about-chlorine.

gas came into contact with the persons body, including their eyes, skin, mouth, and lungs.[51]

50.    "Chlorine gas is a toxic respiratory irritant that is considered a chemical threat agent because of the potential for release in industrial accidents or terrorist attacks. Chlorine inhalation damages the respiratory tract, including the airways and distal lung, and can result in acute lung injury."[52]

51.    HCl (hydrochloric acid) inhalation "in humans has been shown to cause damage to the upper and lower respiratory tracts, resulting in mucous membrane irritation, prolonged hypoxemia, increased airway irritability, broncho-constriction, laryngeal and alveolar oedema, and asthma."[53]

52.    These toxic fumes, therefore, are likely to cause long-term medical issues for Plaintiffs and proposed Class Members.

## CLASS ALLEGATIONS

53.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action individually and on behalf of all others similarly situated with a proposed Class preliminarily defined as:

> All individuals affected by the chemical fire and/or explosion on or about September 29, 2024, at Defendant's plant in Conyers, Georgia.

---

[51] *Id.*

[52] Gary W. Hoyle & Erik R. Svendsen, *Persistent Effects of Chlorine Inhalation on Respiratory Health*, NAT'L INST. OF HEALTH (published in final form in August 2016 in *Ann N.Y. Acad Sci.*), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5063681/pdf/nihms789158.pdf.

[53] Stephen H. Boyce & Kenneth A. Simpson, 1996 Accid. Emerg. Med. 13, at 422–424, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1342817/pdf/jaccidem00015-0054.pdf

54.     Excluded from the Class are Defendant, its parent, subsidiaries, affiliates, officers, directors, members of their immediate families, and any entities in which the foregoing own a controlling interest. Further excluded are the legal representatives, heirs, successors, and assigns of any of the aforementioned excluded parties, as well as any judicial officer assigned to this or a related action and members of their immediate families.

55.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class and/or to add a subclass(es) if necessary, including a liability issue class under Fed. R. Civ. Proc. 23, before this Court determines whether certification is appropriate.

56.     *Fed. R. Civ. Proc. 23(a)(1) Numerosity:* The Class is so numerous such that joinder of all Members is impracticable. Upon information and belief, and subject to class discovery, the Class consists of no less than 17,000 persons in and around the BioLab Plant that were warned of the impending harms stemming from the chemical plant explosion and subsequent release of toxic fumes.

57.     *Fed. R. Civ. Proc. 23(a)(2) and (b)(3) Predominance:* There are numerous questions of law and fact common to the Class. As such, there is a well-defined community of interest among the Members of the Class. These questions predominate over questions that may affect only individual Members of the Class because Defendant has acted on grounds generally applicable to the Class. Such

common legal or factual questions include, but are not limited to:

a.    Whether Defendant had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of its chemical manufacturing in Conyers, Georgia;

b.    Whether Defendant knew or should have known that its policies, processes, practices, and procedures were insufficient to ensure the safety of its plant operations at the BioLab Plant;

c.    Whether Defendant breached its duty of care to ensure the safety of the BioLab Plant and to avoid releasing toxic fumes into the surrounding area;

d.    The extent to which Defendant was on notice of the substandard safety practices at the BioLab Plant;

e.    Whether Defendant failed to adequately respond to the September 29, 2024 fire;

f.    Whether Defendant's failures amounted to negligence;

g.    Whether Defendant's actions amounted to trespass;

h.    Whether Defendant's actions amounted to nuisance;

i.    Whether exposure under these circumstances causes long-term medical issues that warranted medical monitoring at Defendant's

expense;

j.   Whether Plaintiffs and the Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

k.   Whether Defendant's acts violated the law; and;

l.   Whether Plaintiff and the Class Members are entitled to damages including compensatory and punitive damages, and/or injunctive relief.

58.   *Fed. R. Civ. Proc. 23(a)(3) Typicality:* Plaintiffs' claims are typical of the claims of all Class Members, because all such claims arise from the same set of facts regarding Defendant's failures:

a.   to implement appropriate safety procedures and precautions to mitigate the risk of exposing Plaintiffs and the proposed Class Members to the effects of toxic fumes;

b.   to discovery and remedy the risks associates with Defendant's lax safety practices; and

c.   to disclose to Plaintiff and Class Members the harms associated with its operations of a chemical plant in their neighborhood that had a history of safety issues and to ensure Plaintiffs were timely notified of the risk that such a fire, explosion, and release of toxic fumes would occur.

59.    *Fed. R. Civ. Proc. 23 (a)(4) Adequacy:* Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are more than adequate representatives of the Class in that Plaintiffs are and were a victim of the plant explosion and release of toxic fumes, have suffered injury and damages because of the same, and bring the same claims on behalf of themselves and the putative Class. Plaintiffs have no interests antagonistic to that of the proposed Class Members. Plaintiffs have retained counsel who are competent and experienced in litigating class actions. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the proposed Class Members' interests.

60.    *Fed. R. Civ. Proc. 23 (b)(2) Injunctive and Declaratory Relief:* Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

61.    *Fed. R. Civ. Proc. 23 (b)(3) Superiority:* It is impracticable to bring Class Members' individual claims before the Court. Class treatment permits many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress

on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. A class action is especially appropriate here because potentially thousands of individual claims would otherwise be brought for proposed Class Members for achieve relief.

62.     A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

      a.    Concentrating the litigation of the claims in one forum is desirable;

      b.    Litigating separate cases on behalf of thousands of individuals is impractical, especially given the scope of discovery and expert testimony that is likely necessary in this case;

      c.    Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

      d.    Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

63.     Plaintiffs know of no unique difficulty to be encountered in the prosecution of this action that would preclude its maintenance as a class action.

64.     *Fed. R. Civ. Proc. 23 (c)(4) Issue Certification:* Likewise, particular issues under Fed. R. Civ. Proc. 23 (c)(4) are appropriate for certification because

such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing and safeguarding toxic chemicals that, if released, could and would place Plaintiffs and members of the proposed Class at a substantially heightened risk of medical infirmities and symptoms;

    b.    Whether Defendant's security measures to protect against the release of toxic fumes were reasonable and in accordance with applicable industry standards and regulatory guidelines, standards, and/or rules;

    c.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    d.    Whether Defendant failed to take commercially reasonable steps to safeguard toxic chemicals from fire, explosion, and release into the surrounding atmosphere; and

    e.    Whether adherence to applicable rules, guidelines, and industry standards would have reasonably prevented the fire, explosion, and resulting release of toxic fumes.

65.     Finally, all Members of the proposed Class are ascertainable, as they include all those persons who were affected by the release of toxic fumes, which is ascertainable by beginning with those ordered to stay indoors or evacuate.

## COUNT I
## NEGLIGENCE
### (on behalf of Plaintiffs and the Proposed Class)

66.     Plaintiffs incorporate and reallege all previous paragraphs as if fully set forth herein.

67.     Defendant knew or should have known of the risk of fire and explosion at the BioLab Plant.

68.     Indeed, Defendant was on notice of the harms associated with chemical fires and explosions at least because of its prior safety incidents.

69.     Defendant should have known of the risks to citizens and property in the area surrounding the BioLab Plant, including the risk that a fire and/or explosion would lead to toxic fumes, dust, particulate matter, smoke, and potentially debris being blown into and onto the property and homes of residents.

70.     Defendant knew or should have known that the release of such toxic fumes and other matters would present a significant risk of property damage, including the diminution of value to the Plaintiffs' property and the loss of enjoyment of the same.

71.     Defendant knew or should have known that the release of such toxic fumes and other matters could and would cause significant health issues in the Conyers, Georgia, community and its surrounding areas, and that affected individuals would require medical attention and would likely suffer long-term health problems as a result.

72.     Defendant had a duty to exercise reasonable care to protect the public against foreseeable risks associated with the operation of the BioLab Plant. Indeed, the risk of toxic gas exposure were well known to Defendant, including medical problems and loss of the use and enjoyment of affected persons' property.

73.     Defendant had a duty to prevent the release of such toxic fumes into the air from the BioLab Plant.

74.     Defendant was also aware of the safety concerns at the BioLab Plant, as well as its other locations, due to the several prior safety events.

75.     Defendant breached this duty, as it has done in the past, causing widespread interference with property rights and causing widespread medical injuries, by, without limitation:

> a.     Failing to comply with applicable regulatory requirements and guidelines;
>
> b.     Failing to update its security practices after prior safety events;

c.  Failing to develop proper auditing procedures and risk analyses to ensure fires would not lead to chemical explosions;

d.  Failing to inform the public of the dangers of living in close proximity to Defendant's operations;

e.  Failing to implement sufficient fire suppression procedures and practices; and

f.  Otherwise failing to institute reasonable and adequate safety measures sufficient to ensure its plant operations and foreseeably occurring therefrom would not lead to the harmful exposure of toxic substances to surrounding areas and inhabitants.

76.   As a direct and proximate result of Defendant's failures, Plaintiffs have suffered and will continue to suffer widespread exposure to toxic fumes, including chlorine and HCl.

77.   As a direct and proximate result of Defendant's failures, Plaintiffs have suffered and will continue to suffer monetary damages in the form of increased medical care requirements, expenses to cleanup toxic substances, diminution of value of their property as a result of a history of chemical disasters due to the operation of the BioLab Plant; and costs and loss of time necessary to investigate the explosion and effects therefrom.

**COUNT II**
**NUISANCE**
**(on behalf of Plaintiffs and the Proposed Class)**

78.     Plaintiffs incorporate and reallege all previous paragraphs as if fully set forth herein.

79.     Defendant knew or should have known of the risk of fire and explosion at the BioLab Plant.

80.     Indeed, Defendant was on notice of the harms associated with chemical fires and explosions at least because of its prior safety incidents.

81.     Defendant should have known of the risks to citizens and property in the area surrounding the BioLab Plant, including the risk that a fire and/or explosion would lead to toxic fumes, dust, particulate matter, smoke, and potentially debris being blown into and onto the property and homes of residents.

82.     Defendant knew or should have known that the release of such toxic fumes and other matters would present a significant risk of property damage, including the diminution of value to the Plaintiffs' property and the loss of enjoyment of the same.

83.     The explosion and subsequent release of toxic fumes and other matters in Conyers, Georgia, and the surrounding area interfered with Plaintiffs' and the proposed Class Members' enjoyment of their property, as they were required to

remain indoors and turn off their air conditioning in the Georgia summer, among other interferences, which constitutes a private nuisance.

84.    Ga. Code Ann. § 41-1-4 provides a private right of action to bring a private nuisance claim against Defendant.

85.    A nuisance is anything that causes hurt, inconvenience, or damage to the property of another, which occurred here when Defendant's chemical fire and explosion prevent Plaintiffs from being able to use or enjoy their property, and indeed required that they stay inside and turn off their air conditioning.

86.    Defendant's interference with Plaintiffs' use and enjoyment of their land occurred in bad faith, as is evident from the multitude of prior safety events that should have prompted Defendant to undergo a full audit of its safety practices to ensure this fire and explosion never occurred.

87.    Because of Defendant's failures and interferences, Plaintiffs and the proposed Class Members have suffered damages to their person and property caused by the intrusion of toxic fumes on their property and persons.

## COUNT III
## TRESPASS
**(on behalf of Plaintiffs and the Proposed Class)**

88.    Plaintiffs incorporate and reallege all previous paragraphs as if fully set forth herein.

89.     Defendant knew or should have known of the risk of fire and explosion at the BioLab Plant.

90.     Indeed, Defendant was on notice of the harms associated with chemical fires and explosions at least because of its prior safety incidents.

91.     Defendant should have known of the risks to citizens and property in the area surrounding the BioLab Plant, including the risk that a fire and/or explosion would lead to toxic fumes, dust, particulate matter, smoke, and potentially debris being blown into and onto the property and homes of residents.

92.     Defendant knew or should have known that the release of such toxic fumes and other matters would present a significant risk of property damage, including the diminution of value to the Plaintiffs' property and the loss of enjoyment of the same.

93.     The explosion and subsequent release of toxic fumes and other matters in Conyers, Georgia, and the surrounding area interfered with Plaintiffs' and the proposed Class Members' enjoyment of their property, as they were required to remain indoors and turn off their air conditioning in the Georgia summer, among other interferences.

94.     The fire and explosion resulted in the mass discharge of toxic chemicals into the surrounding area, including Chlorine, which then invaded Plaintiffs' and the proposed Class Members' property and prevented them from using the same.

95.     Plaintiffs and the proposed Class Members did not consent to the entry of the toxic fumes and other materials on their land.

96.     This intrusion and interference with the enjoyment of land is ongoing and represents an unreasonable and unlawful trespass, which has interfered with Plaintiffs' and the proposed Class Members' possessory rights, and which was entirely foreseeable given that Defendant has experience with harmful safety events.

97.     As a direct and proximate cause of Defendant's trespass, Plaintiffs and the proposed Class Members sustained and continue to sustain a loss of their ability to use and enjoy their respective properties.

98.     As a direct and proximate cause of Defendant's trespass, Plaintiffs and the proposed Class Members have incurred, and will continue to incur, monetary damages arising from the lost use and enjoyment of their properties, which was caused by Defendant's conduct, and will likely incur monetary damages to clean up from Defendant's chemical disaster.

## COUNT IV
## MEDICAL MONITORING
### (on behalf of Plaintiffs and the Proposed Class)

99.     Plaintiffs incorporate and reallege all previous paragraphs as if fully set forth herein.

100.    Plaintiffs and Class Members have been exposed to significant amounts of chlorine gas, as alleged, at levels that are far higher than normal background

levels. These toxic substances are dangerous toxins that have been proven to cause long-term health effects in humans, including bronchitis, asthma, sequelae of pulmonary edema and lung injury, and neurobehavioral effects including memory loss, slowed reaction time, impaired balance, hearing loss, and visual alterations.

101.   Moreover, the exposure of toxic fumes places Plaintiffs at severe risk of long-term respiratory issues.

102.   Plaintiffs and Class Members were exposed to these toxic substances as alleged, as a direct and proximate result of Defendant's tortious actions, including Defendant's negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

103.   As a direct and proximate result of their exposure to these toxic substances as alleged, Plaintiffs and Class Members have a significantly increased risk of developing bronchitis, asthma, sequelae of pulmonary edema and lung injury, and neurobehavioral effects including memory loss, slowed reaction time, impaired balance, hearing loss, and visual alterations, among other long term infirmities. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

104.   This increased risk of bronchitis, asthma, sequelae of pulmonary edema and lung injury, and neurobehavioral effects including memory loss, slowed reaction

time, impaired balance, hearing loss, and visual alterations would warrant a reasonable physician to order monitoring.

105.   Early diagnosis of these diseases and health effects has significant value for Plaintiffs and Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

106.   Monitoring procedures exist that make early detection of these diseases and health effects possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and Class Members' exposure to the toxic substances as alleged, because of Defendant's actions as alleged herein.

107.   As a direct and proximate result of Plaintiffs' and Class Members' exposure to the toxic substances and toxic fumes, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances and toxic fumes and, as a remedy for the conduct alleged.

108.   As a result, Plaintiffs and Class Members should be awarded the quantifiable costs of such a monitoring regime.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Cheri Forte and her minor child L.C., individually and on behalf of all others similarly situated, request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class;

B. Appointing Plaintiffs' counsel as Class Counsel and Plaintiffs as Class Representatives;

C. Awarding Plaintiffs' and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of the Class;

E. Awarding attorneys' fees, costs, and expenses, as allowed by law;

F. Awarding pre- and post- judgment interest, as provided by law; and

G. Granting such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 1, 2024              Respectfully submitted,

_/s/ Joseph B. Alonso_
Joseph B. Alonso
GA Bar No. 013627
Daniel H. Wirth
GA Bar No. 873443
**ALONSO & WIRTH**
1708 Peachtree Street, Suite 303
Atlanta, GA 30309
(678) 928-4472
jalonso@alonsowirth.com
dwirth@alonsowirth.com

J. Gerard Stranch, IV
**STRANCH, JENNINGS & GARVEY PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com

Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Boulevard, Suite 500
Ft. Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878

gklinger@milberg.com

Lynn A. Toops
**COHEN & MALAD LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel:
ltoops@cohenandmalad.com

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D, the attached pleading complies with the font and point selections prescribed by Local Rule 5.1B & C and uses 14-point Times New Roman font.

*/s/ Joseph B. Alonso*
Joseph B. Alonso
Georgia Bar No. 013627